# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,                    Criminal Case: 17-20531

v.                                Judge: Bernard A. Friedman

D-3 TORIBIO CASTILLO,

     Defendant.

---

## DEFENDANT CASTILLO'S MOTION TO SUPPRESS FRUITS OF ILLEGAL WIRETAPS OR, IN THE ALTERNATIVE, FOR A *FRANKS* HEARING

Defendant Toribio Castillo (D-3), by and through his counsel and pursuant to 18 U.S.C. §§ 2515 and 2518(10) and the Fourth Amendment to the United States Constitution, moves this Court to suppress the government's wiretap intercepts and all evidence derived from them. Alternatively, this motion seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154; 98 S. Ct. 2674 (1978).

This motion is based upon the attached Memorandum of Points and Authorities, attachments, exhibits, the files and records in this case, and any argument or evidence which may be presented during the pendency of this motion and at the hearing on this and related motions.

1

<u>**MEMORANDUM OF POINTS & AUTHORITIES**</u>

## I.     INTRODUCTION

On June 12, 2017, the United States sought and obtained authority to intercept telephone conversations conducted over Rafael Ramirez' mobile telephone (hereinafter referred to as target telephone one), alleged to be utilized by Saul Santiago-Roldan (D-1).[1]  On July 12, 2017, the United States sought and obtained an order extending the wiretap on target telephone one.   Included in the government's application for the extension on telephone one was an initial request for the authorization to intercept telephone conversations conducted over Albert Gomez's mobile telephone (hereinafter referred to as target telephone two), also believed to be utilized by Santiago-Roldan (D-1).[2]

The affidavit and application filed in support of the extension of the wiretap on telephone one and the initial wiretap on telephone two is rife with inaccuracies, misstatements, and material omissions that fundamentally mischaracterized the facts and status of the investigation.   Accordingly, the wiretap application for the

---

[1] The agent's application and affidavit in support of the government's request for authority to tap target telephone one is hereinafter referred to as "telephone one application", "telephone one affidavit", or "telephone one order," with the corresponding page number.  The full document, Order, Application and Affidavit, is attached hereto as "Exhibit A."

[2] The agent's application and affidavit in support of the government's first request to extend the wiretap on telephone one and request for authority to tap telephone two is hereinafter referred to as "telephone two application," "telephone two affidavit" or "telephone two order," with the corresponding page number.  The full document, Order, Application and Affidavit, is attached hereto as "Exhibit B."

extension and the initial wiretap on telephone two failed to comply with Title III of the Omnibus Crime Control and Safe Streets Act.   Namely, (1) the application and affidavit were not supported by probable cause, (2) the wiretaps were not necessary to the investigation, and (3) the non-pertinent communications were not properly minimized.

Pursuant to 18 U.S.C. §2518(10), Defendant Castillo moves to suppress the fruits of these wiretaps on the grounds that they were illegally intercepted because they were based upon numerous material misstatements and omissions, they lacked a sufficient showing of necessity, and probable cause was not established for the extension or the initial wiretap on telephone two.   In the alternative, Defendant Castillo requests an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to test the validity, accuracy, and completeness of the affidavits.

## II.    RELEVANT FACTUAL BACKGROUND

Stemming from an investigation that began in March of 2017, on June 12, 2017, the United States sought and obtained authority to intercept telephone conversations believed to be conducted by Santiago-Roldan over target telephone one.   In support of its request, the government indicated that Santiago-Roldan was utilizing telephone one in furtherance of what the government alleged to be a multi-kilogram heroin and cocaine drug trafficking operation in Detroit, Michigan. (Exhibit A, Target Telephone One Affidavit, p. 7, 16).

According to the government, Santiago-Roldan has had numerous contacts with the authorities, beginning in 1998 when he was first apprehended by the United States Border Patrol in Michigan, and continuing up to 2012 with additional arrests by immigration and local authorities.  (Exhibit A, Target Telephone One Affidavit, p. 16).  In an attempt to develop its drug-trafficking case against Santiago-Roldan, the government named several target subjects, including: (1) Saul Santiago-Roldan, (2) Fnu Lnu, (3) Rolando Barrientos, (4) Jermaico Reese, and (5) Luis Lopez. (Exhibit A, Target Telephone One Order, p.2; Application, p. 2, Affidavit, p. 5). Defendant Castillo was not named as a target subject for the target telephone one wiretap.

Prior to initiating its request for the wiretap on telephone one, the government used a host of investigative tools while investigating Santiago-Roldan, including: (1) an undercover informant who employed a recording device while discussing the purchase of heroin with Reese (target suspect four); (2) physical surveillance, which included agents observing Santiago-Roldan delivering drugs to Reese; (3) field tests, which revealed the drugs delivered by Santiago-Roldan to Reese tested positive as heroin; (4) GPS location data on a telephone number believed to be used by Santiago-Roldan (810-455-3709), which then led the agents to identify a vehicle used by Santiago-Roldan (green Jeep Commander); (5) search warrants; (6) an exterior pole camera that captured illegal activity; (7) a MoneyGram record search

that revealed Santiago-Roldan had sent money via MoneyGram 10 times since May 2015; and (8) toll analysis records which led the government to believe that Santiago-Roldan was using a new telephone number, Target Telephone 1. (Exhibit A, Target Telephone One Affidavit, p.16-24).

Despite the wealth of information already obtained, the government insisted that a wiretap on telephone one was necessary because, it was "the only available investigative technique which has reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated, including determining the identity of all the members of the organization, the important routes, transportation routes, locations used to conceal cocaine, heroin, methamphetamine and narcotic proceeds, and the assets purchased from the proceeds derived from the sale of narcotics." (Exhibit A, Target Telephone One Affidavit, p. 33).

After receiving the wiretap for telephone one and having an additional 30 days to investigate Santiago-Roldan with the wiretap, the government claimed again that it would need additional time to further its investigation. As such, on July 12, 2017, the government sought and obtained an order extending the wiretap on target telephone one and also obtained an order for an initial wiretap on telephone two – a number the government also believed to be utilized by Santiago-Roldan. (Exhibit B).

In its affidavit in support of its application, the government broadened its list of target subjects to include the following: (1) Santiago-Roldan, (2) Sergio Deleon; (3) Ricardo Zamora, (4) Unknown Male with a telephone number ending in 2690 (UM-2690), (5) Jermaico Reese, (6) Luis Lopez, (7) Oscar Gomez-Medina, (8) FNU LNU AKA Homero, (9) Luz Maria Riveria, (10) Ralphael Ramirez, (11) Israel Martinez-Chavez, (12) Tine Garcia, (13) Nohemi Santiago, (13) FNU LN AKA Tony, (14) UM-9110,  (15) UM-9412, and (16) others as of yet unknown.  Again, Defendant Castillo was not named as a target subject for the second round of wiretaps, and his telephone number was not one of the numbers identified by the government.

Pursuant to its initial wiretap, the government intercepted numerous calls received and sent by Santiago-Roldan while using target telephone one.  From the intercepted calls, the government summed up its investigation as follows:

1. On June 12, 2017, Homero (target subject 8) informed Santiago-Roldan that he had arranged to deliver "pictures" to a customer.[3]  Santiago-Roldan then called Gomez-Medina (target subject 7) and requested that he drop off the samples of drugs to his home.  Thereafter, Gomez-Medina called Santiago-Roldan to inform him that he dropped off the samples at Santiago-Roldan's

---

[3] According to the government, "picture" is code for a sample smorgasbord of illicit drugs.

6

home and left them with Luz Maria Riveria (subject target subject 9). (Exhibit B, Target Telephone Two Affidavit, p. 16-17).

2. On June 13, 2017, Santiago-Roldan instructed Homero to come over to his home and pick-up the "pictures." Shortly thereafter, agents observed Homero enter Santiago-Roldan's home. Subsequent calls indicated that Homero provided the "pictures" to his customer to test for quality. (Exhibit B, Target Telephone Two Affidavit, p. 17).

3. On June 15, 2017, Santiago-Roldan and Gomez-Medina were overheard discussing the price of a kilogram of drugs and the two then agreed to meet at a local bar, The Corner Pocket. (Exhibit B, Target Telephone Two Affidavit, p. 17).

4. On June 15, 2017, phone calls were intercepted between Santiago-Roldan and Homero indicating that Homero was at his home with Tony (target subject 13). Tony then took the phone from Homero and informed Santiago-Roldan that Victor owed both of them money and they should try to find Victor. Santiago-Roldan then called Rivera and requested that she bring a "toy" to Santiago-Roldan.[4] While conducting surveillance on the home of Homero, agents observed Santiago-Roldan arrive in a Chevrolet Avalanche, "which agents knew Santiago-Roldan used." Shortly thereafter and at the request of

---

[4] According to the government, "toy" is code for gun.

the federal agents, the Michigan State Police stopped the Chevrolet Avalanche, which was occupied by Luis Lopez (target subject 6), Raymond Hinojosa, and Santiago-Roldan.  A search of the vehicle revealed a gun, but Lopez claimed ownership of the weapon.  All three men were photographed and released.  (Exhibit B, Target Telephone Two Affidavit, p. 16-17).

5. On June 20, 2017, Santiago-Roldan and Gomez-Medina were overheard speaking in "coded language" discussing a pending drug load that was set to arrive locally.  Additionally, Gomez-Medina indicated that he was going to cancel his phone and Santiago-Roldan revealed that he had a new telephone number, target telephone two. (Exhibit B, Target Telephone Two Affidavit, p. 18).

6. "Multiple conversations have been intercepted between" Santiago-Roldan and UM 9412 for "the purpose of making arrangements for UM to send what agents believe from coded language to be a total of twelve kilograms of narcotics to Santiago-Roldan."  UM-9412 texted multiple names to Santiago-Roldan for him "to send money to with the understanding that the money was for paying for the transportation of the drugs to Michigan."  (Exhibit B, Target Telephone Two Affidavit, p. 19-20).

7. On June 22, 2017, an undercover source made contact with Santiago-Roldan on target telephone one and Santiago-Roldan told the caller to call him on

target telephone two and "he would be available to sell drugs" to the undercover informant.  (Exhibit B, Target Telephone Two Affidavit, p. 20).

8. Santiago-Roldan and Lopez have made multiple trips to Toledo, Ohio, where agents claim Lopez was picking up money.  According to the government, during a call from Lopez to Santiago-Roldan, Lopez asks Santiago-Roldan "about providing Ohio with more "stuff", which agents believe was code for drugs."  (Exhibit B, Target Telephone Two Affidavit, p. 20).

9. On June 24, 2017, the agents intercepted calls indicating that Santiago-Roldan was travelling to Toledo, Ohio.  Thereafter, agents observed Santiago-Roldan, travelling in a black Jeep Commander, meet with a black Tahoe on the side of street in Toledo.

As for the actual telephone calls that the government intercepted from the wiretap on target telephone one, the vast majority of the telephone calls received and sent by Santiago-Roldan are in Spanish.  Through the use of an interpreter, the government highlighted the following calls as a basis for its request to extend the wiretap on target telephone one and initiate a wiretap on target telephone two:

1. On June 28, 2017, an informant spoke to Santiago-Roldan and the following conversation was intercepted:

**Informant**: "What was I going to say? How are you doing around there, for the weekend?  [U/I] have to do to go have some beers?"

9

**Santiago-Roldan**: Yes, I'll be off later, call me.

According to the government, "the "beers" are units of cocaine (ounces)" that the informant is requesting to purchase from Santiago-Roldan.  (Exhibit B, Target Telephone Two Affidavit, p. 24).

2.  On June 12, 2017, Santiago-Roldan was overheard stating, "Bring me the pictures, if you can."  According to the government, ""pictures" is common code that drug traffickers utilize to reference a sample of drugs, provided to a potential customer to test." (Exhibit B, Target Telephone Two Affidavit, p. 25).

3.  On July 5, 2017, a caller informs Santiago-Roldan, "I have a friend that has the candy $4 has 200 yellow ones really."  According to the government, the term "candy" is "a common term used by drug traffickers when discussing a unit of illegal narcotics prescription pills." (Exhibit B, Target Telephone Two Affidavit, p. 25).

4.  On June 17, 2017, a caller informs Santiago-Roldan, "I'm waiting to sell a fucking lot of land the, I have it on sale.  The fucking land is worth, is worth good money.  I'm giving it at four hundred thousand (400,000) pesos."  The caller later states, "I have, I have two (2) of the cars, of the nice ones and the ten (10) little cars, for the poor people."  According to the government, this conversation is actually coded talk wherein the caller is informing Santiago-

Roldan that he is sending 12 units of drugs from Mexico in the near future and the total bill for the 12 kilos will be $400,000. (Exhibit B, Target Telephone Two Affidavit, p. 30).

5. On June 20, 2017, the government intercepted a call wherein Gomez-Medina stated, "Once the works come, I'll, I'll cover those for you: that what's yours." According to the government, any version of the "work" is "common code to refer to a kilogram of narcotics." (Exhibit B, Target Telephone Two Affidavit, p. 28).

6. On June 30, 2017, the government intercepted a call wherein Santiago-Roldan asked if he and some others could meet with the caller personally to discuss "how we're gonna be working."  During the same conversation, Santiago-Roldan is then overheard stating, "Um, I mean, I'm ready to work bro'.  I've always been ready to, bro'.  I never stop.  You know, Benny knows I never stop bro'." According to the government, this phone conversation is actually in "regards to UM-2690 receiving part of a shipment of drugs which are on the way to Detroit, Michigan for the purpose of redistribution, including UM-2690." (Exhibit B, Target Telephone Two Affidavit, p. 32).

7. On July 6, 2017, the government listened in on a conversation wherein the caller states to Santiago-Roldan, "Alright, it will be two (2) movies." According to the government, the word "movie" is a common term used by

drug traffickers regarding a unit or quantity of heroin.  (Exhibit B, Target Telephone Two Affidavit, p.32).

Although none of the alleged drug deals mentioned above ever materialized, the District Court granted the government's application for an extension of the wiretap on target telephone one and an initial wiretap on target telephone two.

Defendant Castillo maintains that the fruits derived from the extension of the wiretap on target telephone one and the initial wiretap on target telephone two, must be suppressed since the wiretaps were fatally flawed.  Namely, (1) the application and affidavit were not supported by probable cause, (2) the wiretaps were not necessary to the investigation, and (3) the non-pertinent communications were not properly minimized.  In the alternative, Defendant Castillo requests an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to test the validity, accuracy, and completeness of the affidavits.

## ARGUMENT

### III.   Probable Cause Did Not Exist for the Title III Interception and Normal Investigative Procedures did not Appear Unlikely to Succeed.

#### A.   Statutory Requirements

The federal procedure for the interception of wire, oral, or electronic communications is listed in 18 U.S.C. §2518.  With respect to applications, this statute provides: "Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be

12

made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application."  18 U.S.C. §2518. Additionally, this statute requires a "full and complete statement of the facts and circumstances" justifying the applicant's belief that a wiretap order should be issued. This statement must include the details of the offense that has been or "is about to be" committed.  The statute requires a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried.  Finally, the statute requires that every order and extension shall be conducted in such a way to minimize the interception of communications not otherwise subject to interception.  "In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception." 18 U.S.C. §2518(5).

**B.    Standing**

Title III defines an aggrieved person as one "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  The Supreme Court has interpreted these provisions as limiting standing to challenge wiretaps to persons whose Fourth Amendment rights were violated by the interception.  *Alderman v.*

*United States*, 394 U.S. 165, 175-176, n. 9 (1969).  In the case at hand, Defendant Castillo was a party to intercepted calls captured pursuant to an order extending the wiretap for target telephone one and authorizing the initial wiretap on target telephone two.

### C.    Probable Cause

The basic standards for a wiretap are similar to those for a search warrant," and "the question that must be decided in issuing a warrant is whether there is probable cause to believe that evidence of a crime will be uncovered." *United States v. Alfano*, 838 F. 2d 158, 161-62 (6th Cir. 1988); see also *United States v. Giacalone*, 853 F. 2d 470, 482 (6th Cir. 1988).  While there is no specific formula that must be met for a warrant, the evidence must be judged on the totality of the circumstances and in a "reasonable and commonsense manner." *Illinois v. Gates*, 462 U.S. 213, 238; 103 S. Ct. 2317, 2332 (1983).   "Certainty is not required, but rather a fair probability and something more than mere suspicion." *United States v. Poulsen*, 655 F. 3d 492, 504 (6th Cir. 2001).

### 1.  Standard of Review

A wiretap challenge in the district court is, essentially, appellate review of the original authorizing court's decision to permit a wiretap.  *See United States v. Valdez-Pacheco*, 701 F. Supp. 775, 884 (D. Or. 1989).  To warrant suppression for failing to find probable cause, a defendant must show that the district court judge

abused his or her discretion in approving the application. *See United States v. Alfano*, 838 F. 2d 158, 163 (6th Cir. 1988). In determining whether probable cause was established, the application is to be examined based on the totality of the circumstances in a "reasonable fashion and common sense manner." *Id*. at 161. Great deference is given to the issuing judge's determination of probable cause and a reviewing court is to uphold the determination if the record contains a "substantial basis for…concluding that probable cause existed." *United States v. Lambert*, 771 F. 2d 83, 92 (6th Cir. 1985).

### 2. Lack of Probable Cause in the Instant Case

In the case at hand, the government failed to establish a substantial basis that probable cause existed to warrant the re-up on target telephone one and to authorize a wiretap for target telephone two.

In its affidavit, the government indicates that the purpose of its affidavit is to investigate the following crimes: (a) possession with the intent to distribute and distribution of controlled substances, (b) importation of controlled substances, (c) the use of a communications facility in the commission of narcotics offenses, (d) attempts to conspire to commit the aforementioned crimes, and (e) money laundering. (Exhibit B, Target Telephone Two Affidavit, p. 5). The initial affidavit for wiretap on target telephone one lists five target subjects, the affidavit seeking the extension on target telephone one and the initial wiretap on target telephone two lists

16 target subjects.  Of these 16 target subjects, 10 were identified by agents, but only six were discussed in the affidavit.  Along with the name and criminal background of each of the six, the government also added a blurb about each suspect:

1. Deleon – "Deleon was intercepted on target telephone 1 talking to Santiago-Roldan, **requesting to purchase drugs** from Santiago-Roldan."

2. Zamora – "Zamora is a **known cocaine trafficker** who is currently known to be coordinating the shipments of cocaine from Mexico via Texas to Detroit, Michigan."

3. Reese – "DEA agents **seized approximately one and a half kilograms of heroin from Reese** in April of 2017."

4. Lopez – "Lopez has been **identified as a kilogram source of supply** for cocaine for the multiple drug traffickers in Pontiac and Detroit."

5. Gomez-Medina – "An individual agents believe is Gomez-Medina was intercepted on target telephone 1, **discussing kilogram drug transactions** with Santiago-Roldan."

6. Rivera – "Rivera was **intercepted actively doing drug deals** and assisting Santiago-Roldan with his trafficking activities."

The government's application for the extension on target telephone one and the initial wiretap on target telephone two, alleges that the "Santiago-Roldan DTO is responsible for distributing heroin and cocaine in the Detroit, Michigan and

Toledo, Ohio areas." (Exhibit B, Target Telephone Two Affidavit, p. 16). To support its claim, and to obtain the desired wiretaps, the government listed several telephone calls that it believed established that illegal activity was being conducted with target telephone one. (Exhibit B, Target Telephone Two Affidavit, p. 23-33).

After intercepting 30 days of calls on target telephone one, which was being used by Santiago-Roldan, the government highlighted only seven calls in its affidavit. The seven highlighted calls, which were transcribed from Spanish to English, involve conversations between Santiago-Roldan and target subjects Gomez-Medina and Deleon and unknown males 2610, 2690, and 9110. Calls involving the other targeted subjects are not included in the government's affidavit. And while the defense acknowledges that probable cause need not exist for every individual named in a wiretap application and order,[5] here, it appears that the majority of the named targeted subjects were added for shock value and to mislead the reviewing judge regarding the alleged scope of the government's investigation.[6]

Most importantly, none of the calls specifically mentioned in the government's affidavit provide actual evidence of wrongdoing. Instead, every call

---

[5] *See United States v. Martin*, 599 F. 2d 880, 885 (9th Cir. 1979).

[6] While the government may argue that it's a "benefit" to be named in an application in light of the requirement of Section 2518(8)(d) that all individuals named in the application be provided with after the fact notice, here, it appears that the government strategically chose numerous names to link to its investigation.

is deemed drug related based on the agents' "information and belief" that random words are actually code for drugs.  According to the agents: (1) "picture" is code for a sample smorgasbord of drugs; (2) "beer" or "beers" is code for units of cocaine; (3) "candy" is code for illegal narcotic prescription pills; (4) "car" or "cars" is code for a kilo of heroin or cocaine; (5) "land" and prices associated with the sale of "land" is code for setting the price of illegal drugs; (6) "work" and "workers" is code for kilograms of narcotics; and (7) "movie" or "movies" is code for a quantity of heroin.

In addition to the calls obtained during the first 30-day interception period, the government also relied on two other measures to establish probable cause for the desired wiretaps.  Each measure, however, is problematic.  First, the government intercepted calls wherein it deemed that target subject Rivera was instructed to bring a "toy" to Santiago-Roldan.  According to agents, "toy" is code for gun.  Later that same day, Santiago-Roldan was stopped in a vehicle with three other Hispanic males.  The police discovered a gun in the vehicle, however, the driver, target subject Lopez, claimed ownership of the weapon.  (Exhibit B, Target Telephone Two Affidavit, p. 15).  Despite this, the government has attributed the gun to Santiago-Roldan and included this incident as a basis supporting probable cause.  (Exhibit B, Target Telephone Two Affidavit, p. 21).

18

Next, the government utilized an undercover informant who allegedly arranged a drug deal with Santiago-Roldan by requesting to go out and "grab some beers." During this meeting, its alleged that the confidential informant was notified that Santiago-Roldan would be using target telephone two in the future. The reliability of this informant is questionable, especially since he or she has never provided reliable information to the government in the past. Despite this, the agents deemed the informant reliable "in relation to this investigation." (Exhibit B, Target Telephone Two Affidavit, p. 15).

The three measures listed above, (1) intercepted calls on target telephone one, (2) one outing with an undercover informant, and (3) one police stop where Santiago-Roldan was a backseat passenger, is what was used to establish probable cause. As indicated in *Poulsen*, the government needed to establish "a fair probability" that evidence of a crime would be uncovered through the use of the wiretaps and that "mere suspicion" of criminal activity is not enough to establish probable cause. *United States v. Poulsen*, 655 F. 3d 492, 504 (6th Cir. 2011). The only thing the government's affidavit established is that federal agents believe virtually every object to be associated with drug activity – picture, beer, work, movie, car, land, candy, etc. If the government is permitted to deem every call "coded" simply based on its "information and belief" there is absolutely no need for Title III.

Based on the above, the issuing judge abused its discretion in granting the government's application to extend its wiretap on target telephone one and authorize a wiretap on target telephone two.  Based upon the totality of the circumstances, the reviewing judge should not have deemed a substantial basis existed for authorizing the wiretaps.

### 3.    Lack of Necessity

Congress intended that wiretap surveillance not be "routinely employed as the initial step in a criminal investigation, [r]ather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Giordana*, 416 U.S. 505, 515 (1974).  The purpose of the necessary requirement is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose their crime.  *United States v. Kahn*, 415 U.S. 143, 153, n. 12 (1974).  Thus, wiretaps are not to be used thoughtlessly or in a dragnet fashion.  *United States v. Alfano*, 838 F. 2d 158, 163 (6th Cir. 1988). As our Sixth Circuit has held, what is needed is to show that wiretaps are not being "routinely employed as the initial step in criminal investigation." *United States v. Landmesser*, 553 F. 2d 17, 20 (6th Cir. 1977).  Obviously, every conceivable investigative tool need not be used, but the investigators must give serious consideration to non-wiretap techniques prior to applying for wiretap

authority and the investigators must inform the court of the reasons for their belief that such non-wiretap techniques have been or will likely be inadequate. *Id*. at 91.

Turning to this case, the government's affidavit devotes 18 pages to necessity. (Exhibit B, Target Telephone Two Affidavit, p. 35-53). The specific investigative techniques utilized by the government included: (1) physical surveillance, (2) the use of one confidential source on one occasion, (3) one attempted trash pull which failed, (4) the use of one mobile tracking device, (5) the use of one pole camera, and (4) the use of toll records and pen registers.

The traditional investigative techniques that were considered by the government but not utilized include: (1) convening a grand jury; (2) using an undercover agent, (3) conducting controlled purchases, (4) utilizing search warrants, (5) using administrative and grand jury subpoenas, (6) conducting a financial investigation, and (7) interviewing knowledgeable parties.

The glaring problem with the government's affidavit is it claims that the ONLY investigative tool that will work in its investigation is wiretaps. Specifically, the government claimed that based on the affiant's knowledge, information and belief:

> [**T**]**he interception of wire and electronic communications** of the target subjects and others yet unknown on the target telephones **is the only available investigative technique** which has reasonable likelihood of revealing and of securing admissible evidence needed to establish the full scope and nature of the offenses being investigated, including determining the identity of all the members

of the organization, the importation routes, transportation routes, locations used to conceal cocaine, heroin, methamphetamine and narcotics proceeds, and assets purchased from the proceeds derived from the sale of narcotics."   (Exhibit B, Target Telephone Two Affidavit, emphasis added, p. 36).

For the government to claim that the only way it can investigate a case is through the use of wiretaps negates the need for Title III and also calls into question whether "serious consideration" was given to non-wiretap techniques as envisioned in *Lambert*.  *United States v. Lambert*, 771 F. 2d 83, 93 (6th Cir.), cert denied, 474 U.S. 1034, 106 S. Ct. 598 (1985).

Because the government's application extending the wiretap on target telephone one and authorizing a wiretap for target telephone two was not supported by a showing of necessity, this Court should not give deference to the district's court's decision authorizing the taps.

### 4.    Lack of Minimization

Title III requires the government to conduct electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5).   Minimization is accomplished when the interception of non-pertinent calls had been adequately avoided.   To assess minimization efforts, the Court conducts "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Scott v. United States*, 436 U.S. 128, 136, 98 S. Ct. 1717 (1978); *United States v. Feldman*,

606 F. 2d 673, 677–78 (6th Cir.1979).  Title III "does not forbid the interception of all non-relevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott*, 436 U.S. at 140, 98 S. Ct. 1717.

As already discussed above, after the initial 30-day wiretap on target telephone one, the government sought an extension and a new wiretap for target telephone two.  In its affidavit the government provides translated intercepted calls that appear to be innocent in nature, however, the government claims that these calls contain coded drug talk – a code that apparently only the government is privy to. This is of course problematic since such reasoning permits the government to intercept every single call and then determine what is coded drug talk and what is not.  This again alleviates the need for Title III.

## CONCLUSION

For all the reasons stated above, Defendant Castillo maintains that the fruits derived from the extension of the wiretap on target telephone one and the initial wiretap on target telephone two must be suppressed since the wiretaps were fatally flawed.  Namely, (1) the application and affidavit were not supported by probable cause but were instead based on intercepted telephone calls that the government alleges contained coded drug talk, (2) the government failed to establish necessity for the wiretaps since it is clear other investigative techniques were not considered

since the government maintained that the wiretaps were the only technique that would accomplish their goal; and (3) non-pertinent communications were not properly minimized since the government maintains that countless everyday words and phrases are actually coded drug talk thereby permitting them to intercept every call.

In the alternative, Defendant Castillo requests an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) to test the validity, accuracy, and completeness of the affidavit at issue.  A *Franks* hearing in this case is necessary since the affidavit deliberately and recklessly asserts that everyday words and phrases are actually coded drug talk – without further explanation.  Based on this alleged coded drug talk, the government then intercepted a host of calls which were then used to establish probable cause for the extension and additional wiretap.  *See United States v. Graham*, 275 F. 3d 490, 505 (6th Cir. 2001); *United States v. Hill*, 142 F. 3d 305, 310 (6th Cir. 1998).

Respectfully submitted,

LAW OFFICE OF BARTON W. MORRIS, JR.

By:   */s/ Barton W. Morris, Jr.*
      BARTON W. MORRIS, JR. (P54701)
      Counsel for Defendant
      520 North Main Street
      Royal Oak, Michigan 48067
      (248) 541-2600
      Email:  barton@michigancriminalattorney.com

Dated: June 20, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all parties of record.

By:   */s/ Barton W. Morris, Jr.*
      BARTON W. MORRIS, JR. (P54701)
      Counsel for Defendant
      520 North Main Street
      Royal Oak, Michigan 48067
      (248) 541-2600
      Email:  barton@michigancriminalattorney.com

Dated: June 20, 2018